## THE KENNEBEC.

### SEABOARD & GULF S. S. CO. v. BALTIMORE DRY DOCKS & SHIPBUILDING CO.

(District Court, D. Maryland.   July 3, 1918.)

1. WHARVES ⬅➡20(1)—DRY DOCKS—NEGLIGENCE OF OWNER—LIABILITY.
   Where ship undergoing repairs to engine and hull was placed in charge of her master in dry dock for work on the hull, without notice that a freezing temperature without supply of steam would result in damage to her engines and pipes, the owners could not recover from the dry dock owners the cost of repairing damage resulting from the bursting of pipes so caused.

2. WHARVES ⬅➡20(1)—DRY DOCKS—NEGLIGENCE OF OWNER—LIABILITY.
   Where ship was placed in dry docks for repairs to hull, without request that steam be supplied to prevent damage from bursting pipes, owing to the freezing temperature, and with only a casual request from the master that steam or stoves be supplied, so that he could keep his crew, the dock owners were not liable in tort for the damage resulting from bursting pipes.

In Admiralty.   Libel by the Baltimore Dry Docks & Shipbuilding Company against the steamship Kennebec, with cross-libel by the Seaboard & Gulf Steamship Company, owner of the steamship Kennebec, against the libelant.   Original libel sustained, and cross-libel dismissed.

George Weems Williams and L. Vernon Miller, both of Baltimore, Md., for libelant.

Milton Roberts and Clifton S. Brown, both of Baltimore, Md., for respondent.

⬅➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ROSE, District Judge. The libelant will be called the "dry docks;" the respondent, the "ship." It is admitted that the former repaired the latter, and that its bill of $2,988.90 for so doing is fair. It has not been paid, because the ship says that a breach of duty incumbent upon the dry docks cost the ship upwards of $23,000, $4,329.65 of which was the expense of repairing the physical injury done; the balance being in the nature of demurrage. Whether the dry docks was so in default is the question to be determined.

The ship was turned over to the dry docks in the late afternoon of December 27th last, and was taken away three days later. During that period, the water which was in its pipes and engines froze, and did the damage mentioned. For some time prior to going to the dry docks, the ship had, with fires drawn, been lying at the wharf of the W. S. Cahill Company, who will be hereinafter referred to as Cahill. It was there undergoing repairs. During a considerable part of that time the temperature was low, and the ship was kept heated by steam sent through its pipes by Cahill. For a part of the time at least the steam was supplied from a floating welder of Cahill moored alongside of it. When the ship was taken to the dry docks, Cahill's work was still unfinished. Physically it would have been possible to have continued the engine repairs while the ship was at the dry docks, as the work the dry docks was to do was upon the ship's hull. Cahill was willing to go on with his task while the ship was at the dry docks, but the dry docks forbade, in accordance with its general rule of refusing permission to any one else to work upon a ship while on its premises. Its adherence to this policy is in part due to the trouble it would otherwise, during wartime, have in making sure that the governmental regulations for the protection of the water front and the property owners are complied with, and perhaps more largely to its unwillingness to afford any facilities to actual or potential competitors in business.

Had Cahill been permitted to continue its work, it would have kept steam in the ship's pipes. There is nothing in the record which suggests that this particular benefit which the ship would have received from Cahill's presence while in the dry docks was ever, in any way, brought to the attention of the dry docks, or was ever considered by it.

The day after the ship arrived at the dry docks, it was comparatively mild; the thermometer rising to about 40 degrees. At that temperature, the pipes were in no danger; but the living quarters upon an unheated ship were very uncomfortable. Accordingly, in the forenoon of that day, the captain of the ship asked the superintendent of the dry docks to furnish steam, saying, unless he had it, he feared he could not keep his crew. He now thinks he had also in mind the protection of the pipes against the possibility of a cold wave. If he had, he kept it to himself, and said nothing to the dry docks superintendent about it. It would have been quite troublesome and inconvenient for the latter at that time to have furnished steam. I doubt not that it could have been done at a price, but it did not seem worth while, for the mere purpose of retaining the crew on board, instead of sending them to a boarding house on shore. Moreover, the superintendent then supposed that the repairs to the ship could be finished in 24 hours, or there-

abouts, and that elaborate arrangements for so brief a time were unnecessary, and so told the captain.

In consequence of the refusal to furnish steam, an application was subsequently made to the dry docks for oil stoves for the crew's quarters. It so happened that there were none available. When the engineer of the ship learned that steam would not be furnished, he had the pipes drained, so far as that could be done without breaking connections and taking apart certain portions of the machinery. To have done everything necessary to get all the water out of the pipes would have taken, with the force he had at hand, 24 hours and perhaps more. At least that much time would have been required to have put them back, so that the engines could be operated.

As the dry docks went on with the work, it perhaps found there was more to be done in the way of repairs than had originally been apparent, and for that or some other reason the work was not finished until December 30th. During the night of December 28th, the temperature fell rapidly, and on the 29th and 30th went down nearly to zero. On the morning of the last-named day it was discovered that the water, left in the pipes and engine, had frozen, and that the damage for which the ship seeks to recover by its cross-libel had been done.

[1] Had the ship been delivered into the care of the dry docks with notice to the latter that the pipes had not been thoroughly drained, it is quite likely that it would have been responsible for any injury which resulted from its failure either to furnish steam or to drain the pipes effectually. But no such delivery was made. The ship's master and its company remained on board, and the former retained his command. The dry docks had undertaken to make certain repairs, and had assumed no other obligation. If the captain thought that his machinery was in danger without steam, he should have made the fact known to the dry docks, preferably before his ship went there, or at all events before the damage was done. That he did not do. The dry docks did not bind themselves by any contract to furnish steam. The work they were employed to do had nothing to do with the ship's pipes or engines.

[2] It is equally impossible to discover any ground for holding the dry docks liable in tort. The record does not show that they hold themselves out as equipped to supply steam to any of their patrons who have need of it. The fact is quite clear that the master did not have, at any time before the damage was done, its possibility in mind, and consequently had not busied himself to protect the ship against it, either by having the ship's pipes disconnected, or by doing his best to secure a supply of steam. His almost casual request to the dry docks for steam, in order that his crew might be kept comfortable, fell far short of imposing any duty upon it to take steps to protect the pipes, if indeed it was possible for him at that time by any notice to impose any such obligation upon it.

It follows that the libel of the dry docks for the amount of its bill must be sustained, and the cross-libel of the ship dismissed.